**Marcia SWANSON, Relator,**

v.

**MEDTRONICS, INC. and Travelers Insurance Company, Respondents.**

**Bonnie J. SODERBERG, Relator,**

v.

**MEDTRONICS, INC. and Travelers Insurance Company, Respondents.**

**Nos. C1–89–603, C3–89–604.**

Supreme Court of Minnesota.

Aug. 4, 1989.

---

Gary C. Reiter, Mahoney, Dougherty and Mahoney, Minneapolis, for relators.

Michael J. Sauntry, Collins, Buckley, Sauntry & Haugh, St. Paul, for respondents.

KELLEY, Justice.

We review on certiorari two decisions of the Workers' Compensation Court of Appeals affirming, by majority decision, the denial of separate claims for permanent partial disability benefits. We affirm in part and reverse in part.

Medtronics manufactured batteries for pacemakers at the Energy Technology Plant in Brooklyn Center. These batteries were made of iodine and lithium encased in plastic. Because lithium is flammable when it comes in contact with water, the humidity in two rooms at the plant was kept low. In the "1% room,"[1] workers would heat and pour liquid iodine into cells containing solid lithium. From there, the batteries would go to an adjacent "5% room" where leads were welded. Before fully assembled batteries were shipped out, they would be inspected in the "burn-in room." There employees would examine the batteries under a microscope for cracks and iodine seepage, conduct electrical tests and X-ray the batteries.

At some point the employer discovered that the hoods above the iodine pour stations in the 1% room did not adequately vent the iodine vapors outside the building; and in early 1979, the employer reconstructed the ventilation system.

Iodine can have an effect on thyroid hormonal level; and the employer required pre-employment physical examinations. The employer would not hire anyone with a thyroid problem for work in the Energy Technology plant. The employer also conducted regular thyroid tests and apparently would refer employees with low test results to its endocrinologist, Dr. John C. Baumgartner.

After seeing a "couple" of Medtronics employees with low normal thyroid tests and hearing stories about a yellow dust settling in all areas of the plant and other medical problems at the plant, Dr. Baumgartner conducted his own investigation in April 1979. This was after the ventilation system had been improved. He found no evidence of yellow dust at that time. Dr. Baumgartner measured levels of iodine and lithium in urine samples from current employees because both have an effect on the thyroid hormone level. Finding the iodine levels safe and no evidence of lithium,[2] the doctor tried to reassure the concerned employees that if there had been a problem in the plant, it had been corrected.

Bonnie Soderberg and Marcia Swanson started working at the employer's Energy Technology Plant in early 1977. Each had a physical examination before working in

---

**1.** The percentage referred to the humidity.

**2.** Lithium used at the plant was in sheet metal form. In its solid state, it has to be ingested to cause a problem.

the plant; and in each case, the results showed no evidence of a thyroid problem. In April 1979, the company nurse referred both Soderberg and Swanson to Dr. Baumgartner. Both employees were diagnosed as having a thyroid problem, placed on a maintenance program of thyroid hormones, and monitored by regular 6–month examinations. Except for the examinations with Dr. Baumgartner, neither Soderberg nor Swanson lost time from work as a result of their thyroid conditions. The employer's insurer paid for the medical expenses; and the employees received full wages for the time spent at the doctor's office. Soderberg worked for the employer until October 1984 when her job was eliminated. Swanson worked for the employer until she voluntarily quit in July 1985.

In May 1985, Soderberg and Swanson filed claim petitions for permanent partial disability compensation for their thyroid conditions. The employer's insurer denied liability. At some point, the employer's insurer stopped paying for their visits with Dr. Baumgartner and their prescriptions.

Each case was separately litigated before the same compensation judge; and in each case, evidence submitted included the depositions of Dr. Baumgartner and Dr. James W. Theen, an endocrinologist retained by the employer's insurer. In each case Dr. Baumgartner testified the employees' thyroid conditions and need to continue taking medication were causally related to the work place. His opinion was based primarily on the fact that iodine was used in the plant, that studies on a number of employees showed declining thyroid function and that there were other medical problems related thereto. Dr. Baumgartner admitted that there were numerous other causes of thyroid problems; and he further admitted that there were no medically valid studies linking long term iodine exposure with permanent thyroid impairment.

Dr. Theen agreed that iodine exposure could cause thyroid problems; but he ex-

plained that it produced "transient" and nonpermanent dysfunction.[3] Dr. Theen even felt it was possible the employees' histories of iodine exposure precipitated their thyroid problems; but he reiterated that the likelihood of permanent damage from long-term iodine exposure was "slim to none."

In each case, the compensation judge found the evidence insufficient to establish that the employees' thyroid conditions were caused by the employment or that either employee sustained any permanent partial disability arising out of the employment. On appeal, the Workers' Compensation Court of Appeals in each case affirmed by majority decision. We believe that the evidence did establish primary liability. However, we agree that there was insufficient evidence of work-related permanent impairment.

While there was no data collected as to the iodine levels present at the employer's plant prior to the renovation of the ventilation system, there was no dispute that iodine was used on the premises and that a portion of the iodine contaminated air was circulated, in a diluted state, throughout the building. Dr. Theen testified that low level exposure can activate or suppress the thyroid gland; and he agreed that in each case, iodine exposure could have precipitated the thyroid problems. In addition, a number of other employees at the plant had thyroid function problems during the relevant time frame. This would be sufficient to establish the requisite causal link between the existence of the employees' thyroid conditions in 1979 and the work place even though thyroiditis has numerous other causes. *See e.g., Grunst v. Immanuel–St. Joseph Hosp.,* 424 N.W.2d 66 (Minn.1988); *Zweber v. Rosemount, Inc.,* 419 N.W.2d 70 (Minn.1988). *See, generally,* 3A Larson, *The Law of Workmen's Compensation* § 79.51(d) (1989).

At the same time, both doctors believed that there was no valid medical evidence

---

**3.** Of interest, Dr. Theen said that low level iodine exposure can activate or suppress the thyroid gland. As the "dose" increases, the possibility of suppression becomes greater; and

above a certain level, the gland ceases to take iodine and is subject to underfunction or hypofunction.

that linked exposure to nonradioactive iodine and permanent damage. Accordingly, the ultimate conclusion that these two employees suffered no permanent partial disability as a result of the iodine exposure in the work place had ample evidentiary support. *Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54 (Minn.1984). Accordingly, while we reverse the primary liability determination, we affirm the denial of permanent partial disability benefits.

Affirmed in part, reversed in part.

Employees are awarded $400 each on appeal.

POPOVICH, C.J., took no part.